**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PAULA V. WHITING,

              Plaintiff,

              v.

LABAT-ANDERSON, INC.

              Defendant.

Civil Action No. 1:10-cv-00898 (BAH)
Judge Beryl A. Howell

## MEMORANDUM OPINION

The plaintiff, Paula V. Whiting, a former short-term, temporary employee of the

defendant, Labat-Anderson, Inc., brought this lawsuit under Title VII of the Civil Rights Act of

1964, as amended, 42 U.S.C. § 2000e *et seq.* She alleges, in a two-count Complaint, sexual

harassment (Count I) and retaliation (Count II) based on two incidents that allegedly took place

on a single-day while the plaintiff was working as a contract employee for Labat-Anderson, Inc.

at the Department of Justice ("DOJ"). Specifically, the plaintiff alleges that she was "kissed and

touched in a sexual and inappropriate manner" by a DOJ employee, and that her employer both

failed to take corrective action against the DOJ employee and retaliated against the plaintiff for

complaining about the incidents by not giving her another assignment after her short-term

employment ended. Complaint ("Compl."), ECF No. 1, ¶ 8; *id.* at 5. Pending before the Court is

the Defendant's Motion for Summary Judgment ("Def.'s Mot."), ECF No. 28. For the reasons

explained below, the Court will grant the motion.[1]

---

[1] The defendant argues in its Reply that its Motion for Summary Judgment "should be granted without consideration of the Opposition filed by Plaintiff" because the plaintiff filed Plaintiff's Opposition to Defendant's Motion for Summary Judgment, ECF No. 29, late. Def. Labat-Anderson Incorporated's Reply in Supp. of its Mot. for Summ. J. ("Def.'s Reply"), ECF No. 30, at 1. On January 28, 2013, the Court issued an Order to Show Cause why the Motion for Summary Judgment should not be granted as conceded. Minute Order (Jan. 28, 2013). The plaintiff, on February 4, 2013, responded to the Court's Order to Show Cause, stating that her late-filing of the Opposition was a

## I.    FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.    The Plaintiff's Short-Term Employment with the Defendant

In May 2008, the defendant, a consulting firm, hired twenty people, including the

plaintiff, to provide temporary on-site general office services and litigation support services for

the DOJ's Office of Immigration Litigation ("OIL"), for a ninety-day period ending September

30, 2008.  *See* Affidavit of Kathy Davis-Hall ("Davis-Hall Aff."), ECF No. 28-3, ¶¶ 2, 4, 6, 8.

One of the defendant's employees, Kathy Davis-Hall, a Project Supervisor, twice

interviewed the plaintiff before hiring her, making clear in each of the interviews that the

defendant was hiring for a temporary, provisional position that would end in ninety days, on

September 30, 2008, when the DOJ's funding for the project would end.  *See id.* ¶ 9; Transcript

of Deposition of Plaintiff Paula V. Whiting ("Pl.'s Dep."), ECF No. 28-4, at 50:15–17; Def.

Labat-Anderson Incorporated's Statement of Undisputed Facts in Supp. of its Mot. for Summ. J.

---

"mistake," resulting from a miscalculation of the due date, and arguing that the mistake should be considered "excusable neglect."  Pl.'s Response to Order to Show Cause, ECF No. 36 at 3.  The plaintiff's counsel suggests that it was the plaintiff  herself who reminded counsel of the due date for her Opposition.  *See id.*  The plaintiff further argues that allowing the late-filing of her Opposition would not "unfairly prejudice" the defendant.  *Id.* ¶ 4.  The plaintiff also filed, as an exhibit to her response, a Motion for Extension of Time to File Response for Motion for Summary Judgment, ECF No. 36-1, which was re-docketed as a motion at ECF No. 38.  The defendant opposes the motion for an extension for time, arguing that "Plaintiff has regularly and repeatedly ignored the rules governing the prosecution of actions in this Court," and that the plaintiff's explanation that she miscalculated the due date for her Opposition does not constitute "excusable neglect" under Federal Rule of Civil Procedure 6(b).  Def. Labat-Anderson Incorporated's Opp'n to Pl.'s Mot. for an Extension of Time to File Response to Mot. for Summ. J., ECF No. 37, at 6-7.  The Court disagrees.  The Court will accept the plaintiff's explanation as excusable neglect and not allow the plaintiff's counsel's mistakes to prejudice the plaintiff, especially when the delay will not prejudice the defendant.   Accordingly, in the interest of deciding this matter on the merits, the Court will grant *nunc pro tunc* the Plaintiff's Motion for an Extension of Time to File Response for Motion for Summary Judgment, ECF No. 38, retroactively extending the deadline for the plaintiff to file her Opposition to the Motion for Summary Judgment until March 29, 2012.  Therefore, the plaintiff's Opposition will be considered timely filed.

[2] The plaintiff filed a Response to Defendant's Statement of Undisputed Facts ("Pl.'s Facts"), ECF No. 29-1.  The plaintiff does not dispute the majority of the facts outlined in Defendant Labat-Anderson Incorporated's Statement of Undisputed Facts in Support of its Motion for Summary Judgment ("Def.'s Facts"), ECF No. 28-2, but, for those facts that the plaintiff disputes, the plaintiff states only that the defendant's facts in a particular paragraph "are disputed."  She does not cite to specific portions of the record, nor explain on what basis the defendant's facts are disputed.  The Court will therefore "assume that [the] facts identified by the moving party in its statement of material facts are admitted."  LCvR 7(h)(1).  The plaintiff also provides a "Statement of Additional Material Facts."  ECF No. 29-1 at 12-13.  Again, the Court will not consider those "additional material facts" that do not include a citation to the record.  *See* LCvR 7(h)(1).  In any event, even if the "facts" proffered by the plaintiff were considered, the result in this case would be the same.

("Def.'s Facts"), ECF No. 28-2, ¶ 14.  The plaintiff acknowledged that she understood that the position she accepted with the defendant was a short-term position.  *See* Pl.'s Dep. at 50:15–17 (Q: "But she did tell you that that position was temporarily funded?"  A: "Right.").[3]

During the plaintiff's short-term employment with the defendant, she completed work for several individuals at the DOJ, and was supervised by Ms. Davis-Hall, who was based on-site at the DOJ.  *See* Davis-Hall Aff. ¶ 10; Pl.'s Dep. at 54:5–9.

The plaintiff's supervisor reports that, during the plaintiff's first few weeks on the job, the group of DOJ employees with whom the plaintiff was initially assigned – the "Second Circuit team" – was dissatisfied with the plaintiff's performance and asked Ms. Davis-Hall not to assign the plaintiff to work with them on future projects.  *See* Davis-Hall Aff. ¶ 14.  Based on this request and Ms. Davis-Hall's "assessment of Ms. Whiting's limited skill set," Ms. Davis-Hall subsequently reassigned the plaintiff to work in the records department, where the plaintiff helped route records to the appropriate DOJ paralegals and helped maintain the records database. *See id.* ¶ 15.[4]

One of the plaintiff's duties in the records department was to assist Shirley Phelps, a DOJ paralegal, with various office tasks.  Ms. Phelps had previously worked for the defendant, but was subsequently hired by the DOJ.  *See* Pl.'s Dep. at 14:13–19, 187:7–8; Davis-Hall Aff. ¶ 16.

---

[3] While the plaintiff stated in her deposition that she believed the contract funding would end on October 30, 2008, rather than September 30, 2008, the plaintiff does not dispute that she knew she was on a short-term assignment. *See* Pl.'s Dep. at 58:13–18.

[4] Following her reassignment to the records department, there was an incident, on July 7, 2008, where the plaintiff sent an email to several DOJ employees stating that "SOMEONE IS LEAVING 2ND CIRCUIT DOCUMENTS ON MY DESK.  I WAS FIRED FROM 2ND CIRCUIT . . . . PLEASE TELL THE PERSON TO COME GET THE DOCUMENTS."  Davis-Hall Aff. Ex. 1, ECF No. 28-3 (Email from Plaintiff to DOJ employees, dated July 7, 2008) (emphasis in original).  The plaintiff's supervisor spoke with her about this incident and instructed the plaintiff not to send any other emails to DOJ employees without prior approval.  *See* Davis-Hall Aff. ¶ 14.  The plaintiff was clearly not "terminated" by the Second Circuit team but simply reassigned to the records department.

By virtue of her work for Ms. Phelps, the plaintiff regularly interacted with her.  Davis-Hall Aff.

¶ 16.

### B.     The August 11, 2008 Incidents at Issue in this Lawsuit

This lawsuit is premised on two brief incidents that the plaintiff alleges occurred on

August 11, 2008 during her interactions with Ms. Phelps, allegations that Ms. Phelps has denied.

*See* Davis-Hall Aff. ¶ 19; Compl. ¶¶ 8, 10.

The plaintiff alleges that the first incident took place at approximately 8:00 a.m. on

August 11, 2008.  Pl.'s Dep. Ex. 8; Pl.'s Dep. at 112:4–11.  At that time, the plaintiff alleges that

while she was typing at her desk, Ms. Phelps began talking with her and asked if the plaintiff was

"still mad at her."  Pl.'s Dep. at 108:19–21.  The plaintiff responded "[y]es, you know, or

whatever like that."  *Id*. at 108:20–21.  Ms. Phelps then said, "Let me give you a hug," and the

plaintiff refused.  *Id*. at 108:21–22.  The plaintiff then states that Ms. Phelps "ran over to [her],

and the whole time she's laughing."  *Id*. at 109:2–3.

> [A]nd so then she put her hands down like to hug me, but she went past . . . my
> shoulders and . . . grabbed the bottom of my stomach.  And I said 'Get off me.
> Leave me alone.  This is sexual harassment.'  So then she started laughing, and I
> heard Cecily [a co-worker] laughing because she heard Shirley Phelps laugh.  So
> then she started sliding her hand up and then she grabbed my chest, and I was . . .
> in shock, and so then she started kissing on my cheek and on the top of my head.
> And then she kept grabbing my chest and then she started jiggling my chest and
> she kept squeezing it.  And the more I said, get off of me, leave me alone, get off
> me, she kept on laughing.  The more I screamed, the harder she squeezed my
> chest. . . . I said: "Get off of me,' and she just kept on laughing.  So I went to push
> away from the desk like that, and then she pinned me under the desk like that.  I
> said: 'I don't believe this.  Get off of me.  Leave me alone.  This is sexual
> harassment.'  And she kept squeezing my chest and laughing, and so I went back
> like that, and then she ran back in the corner of the cubicle.  And I turned to her
> with my fist, and she said: 'I bought you a present.'  And then she took off
> running.  Then I took off running.

*Id*. at 109:4–110:13.  The plaintiff states that this whole incident lasted "[a] couple

seconds."  *Id*. at 113:17.

The plaintiff alleges that the second incident took place later that day.  *See id*. at 130:9–12.  That afternoon, the plaintiff asserts that Ms. Phelps again approached her and hugged her.  *See id.* at 125:10–126:6, 130:13–133:3.  The plaintiff again objected, and says she was "screaming at the top of [her] lungs."  *Id*. at 130:22.  Ms. Phelps again ignored the plaintiff's objections, approached the plaintiff from behind, grabbed the plaintiff's stomach and again touched the plaintiff's chest, laughing the entire time.  *See id*. at 130:13–131:15.  The second incident, like the first, lasted only "a couple of seconds."  *Id.* at 131:16–18.

Although the incidents upset her, *see id*. at 127:13–21, the plaintiff testified that she was nonetheless able to carry out her job responsibilities.  *See id*. at 127:22–128:2.[5]

### C.   The Plaintiff Reports the Two Incidents, and the Defendant Changes Her Assignment To Avoid Any Further Contact Between the Plaintiff and Ms. Phelps

The plaintiff first informed her supervisor, in passing, on the morning of August 11, 2008 about the first incident.  *See id*. at 121:9–122:22, 124:1–22; Def.'s Facts ¶ 38 n.5.  Specifically, the plaintiff states that Ms. Davis-Hall was "walking past" the plaintiff's desk that morning, and Ms. Davis-Hall inquired whether the plaintiff had been in the office earlier that morning because she had not signed in that morning, a question that the plaintiff understood as an accusation that the plaintiff had not been at work that morning.  *See* Pl.'s Dep. at 121:9–20; Pl.'s Dep. Ex. 8.  In response, the plaintiff says she told her supervisor: "I got proof, and Shirley Phelps saw me."  *Id*.

---

[5] In her deposition, the plaintiff referenced incidents that occurred on her first two days working for the defendant in which Ms. Phelps hovered over the plaintiff and "smacked" the plaintiff's hand when the plaintiff mistyped a letter.  *See* Pl.'s Dep. at 22:10–24:16.  The plaintiff also stated that after these incidents she requested that her supervisor reassign her so that she did not have to work for Ms. Phelps.  *Id*.  These allegations, however, do not appear in the Complaint and, since they were not raised in the earlier EEOC Charge of Discrimination, *see* Pl.'s Dep. Ex. 13 (Charge of Discrimination filed by Paula V. Whiting against Labat-Anderson, Inc., Agency Charge No. 570-2008-00055 (Nov. 10, 2008)), the plaintiff may not use allegations of this earlier unrelated conduct to satisfy her prima facie case of sex discrimination.  *See, e.g., Park v. Howard Univ*., 71 F.3d 904, 907 ("A Title VII lawsuit following the EEOC charge is limited in scope to claims that are 'like or reasonably related to the allegations of the charge and growing out of such allegations'") (quoting *Cheek v. Western and Southern Life Ins. Co*., 31 F.3d 497, 500 (7th Cir. 1994)).

at 121:21–22. The plaintiff says her supervisor then responded, "I talked to her, and she ain't seen you." *Id*. at 121:22–122:1. The plaintiff states that she then told her supervisor, "Yes. She saw me. She grabbed me and everything," and then elaborated that Ms. Phelps "grabbed me and was hugging and kissing on me." *Id*. at 122:1–5. The plaintiff did not at that time elaborate on the morning incident, and did not tell Ms. Davis-Hall that Ms. Phelps had touched her breasts. *Id*. at 122:11–13. The plaintiff then asserts that she asked her supervisor, "Can I be reassigned and moved?" *Id*. at 122:6. When the plaintiff was asked how her supervisor responded she says, "She wasn't worried about what Shirley Phelps did to me." *Id*. at 124:1–2. According to the plaintiff, she only spoke with her supervisor that morning "[l]ong enough to give the okay that she believed that I had been there all day." *Id*. at 124:3–5. The plaintiff then went back to doing her work. *Id*. at 125:1–6.[6]

Later that day, after the second incident, the plaintiff reported both incidents to Ms. Davis-Hall. *See* Davis-Hall Aff. ¶ 17. Specifically, the defendant recounts that the plaintiff entered the office of Ms. Davis-Hall at approximately 4:45 p.m while Ms. Davis-Hall was meeting with another employee. The plaintiff reported at that time that "Ms. Phelps had just hugged and kissed her." *Id*.; Pl.'s Dep. at 126:6–7. The plaintiff did not report that Ms. Phelps had touched her breasts.[7] *See* Davis-Hall Aff. ¶ 17; Pl.'s Dep. at 133:21–134:11, 135:10–22. At that time, Ms. Davis-Hall asked if the plaintiff wanted to file a complaint, but the plaintiff

---

[6] The defendant suggests that the plaintiff "initially did not inform Ms. Davis-Hall of the [morning] incident because she thought it was an accident." Def.'s Facts ¶ 38 n.5. The defendant misreads the plaintiff's deposition and written statement, however. The plaintiff testified that she did not object initially *to Ms. Phelps* about the inappropriate touching when she thought the touching was accidental, *see* Pl.'s Dep. at 114:13–22; Pl.'s Ex. 8, but as soon as she realized the touching was not accidental, she told Ms. Phelps to leave her alone. Pl.'s Dep. at 110:6–7; Pl.'s Dep. Ex. 8.

[7] The defendant states in its Statement of Undisputed Facts that the plaintiff "did report to Ms. Davis-Hall that Ms. Phelps had touched Plaintiff's breasts." Def.'s Facts ¶ 39. That appears to be a typographical error, however, as Ms. Davis-Hall's affidavit, on which the defendant relies, states clearly that "Ms. Whiting did not tell me that Ms. Phelps had touched her breasts." Davis-Hall Aff. ¶ 17.

insisted that she did *not* want to file a complaint because she did not want to get anyone in trouble. *See* Pl.'s Dep. at 134:8–11; Davis-Hall Aff. ¶ 17. The plaintiff asked only that Ms. Davis-Hall reassign the plaintiff away from Ms. Phelps and otherwise keep Ms. Phelps away from the plaintiff. *See* Pl.'s Dep. at 126:14–16, 134:8–11, 135:5–7; Davis-Hall Aff. ¶ 17.

In response to the plaintiff's request, Ms. Davis-Hall immediately took a number of actions: first, she notified Ms. Phelps' supervisor about the plaintiff's accusations. Davis-Hall Aff. ¶ 18. Second, she spoke directly with Ms. Phelps, who "denied Ms. Whiting's allegations." *Id.* ¶ 19. Third, she "immediately changed the office procedures and beg[a]n picking up and delivering work files from Ms. Phelps' office rather than requiring Ms. Whiting to do so in order to limit further contact between Ms. Whiting and Ms. Phelps." *Id.* ¶ 20.

After the plaintiff reported the incident to her supervisor on the afternoon of August 11, 2008, there were no other incidents involving the plaintiff and Ms. Phelps.[8] *See id.* Moreover, the plaintiff filed no formal complaint about her interactions with Ms. Phelps, and apparently did not report the incidents to anyone else in an authority position, nor ask for any additional action on the part of the defendant's management. *See id.* While the plaintiff informed two co-workers about the incident, *see* Pl.'s Dep. at 128:8–22, neither of these co-workers had any managerial authority, *see* Davis-Hall Aff. ¶ 17 n.2.

---

[8] The plaintiff argues in her Opposition that "[c]ontrary to Defendant's claim that Plaintiff had little interaction with Ms. Phelps after Plaintiff made the complaint, Plaintiff continued to work for Ms. Phelps on a consistent basis until September 3, 2008." Pl.'s Opp'n at 5. In support of this contention, the plaintiff's counsel cites an unsworn phone conversation with the plaintiff on March 28, 2012, and states that contacting the plaintiff for purposes of obtaining a sworn affidavit is "near impossible." *Id.* Apparently, the plaintiff's counsel have consistently had difficulty communicating with their client. *See, e.g.*, Pl.'s Mot. to Extend the Deadline for Discovery, ECF No. 23, at 1 ("Plaintiff has been unavailable for a large portion of each month because her telephone has been turned off continually for financial reasons."); Pl.'s Resp. to Court to Accept Late Serv. of Compl., ECF No. 9, at 1–2 (discussing the difficulty counsel had communicating with the plaintiff). There is no basis, however, for the Court to consider extra-record evidence consisting of hearsay accounts by counsel of unsworn statements. *See* FED. R. CIV. P. 56(c)(1)(A). Furthermore, it is uncontested that the plaintiff alleged no further harassment from Ms. Phelps after she made her complaint.

**D.      The Plaintiff Distributes a "Sexual Harassment Complaint," and the Defendant Reassigns Her to Another Worksite**

Nearly a month after the alleged incidents, with the encouragement of her friends and family, *see* Pl.'s Dep. at 91:22–92:6, the plaintiff began distributing to individuals who walked by her desk a written statement entitled "A SEXUAL HARASSMENT COMPLAINT AGAINST SHIRLEY PHELPS," *see id.* Ex. 8 (emphasis in original). *See* Pl.'s Dep. at 149:8–14.  The written statement described the alleged incidents of August 11, 2008, claimed that the plaintiff was sexually harassed by Ms. Phelps (whom the plaintiff mistakenly referred to in the written statement as her "boss"), and detailed the reporting of those incidents to Ms. Davis-Hall. *See id.* Ex. 8.

According to the plaintiff, Ms. Davis-Hall learned about the written statement because the plaintiff asked Ms. Phelps' supervisor, who was a notary, to "notarize" the statement, and the supervisor informed Ms. Davis-Hall about it.  Pl.'s Dep. at 18:6–18.  Upon learning about the statement, Ms. Davis-Hall requested a copy from the plaintiff.  *See* Davis-Hall Aff. ¶ 21. Initially, the plaintiff emailed Ms. Davis-Hall back, saying just "I don't want to talk to nobody.  I just want to file a complaint and there is my statement."  Pl.'s Dep. Ex. 9; Davis-Hall Aff. ¶ 21; Davis-Hall Aff. Ex. 4 (Email from the plaintiff to Kathy Davis-Hall, dated Sept. 3, 2008).  Ms. Davis-Hall emailed the plaintiff back and informed her that she would need her cooperation in order to respond to the plaintiff's allegations.  *See* Davis-Hall Aff. ¶ 21; Davis-Hall Aff. Ex. 4; Pl.'s Dep. Ex. 9.  Ms. Davis-Hall also immediately contacted the defendant's director of Human Resources, Sandy Laboon, to inform her about the plaintiff's allegations and the written statement she was distributing to other employees.  *See* Davis-Hall Aff. ¶¶ 21-22; Pl.'s Dep. at 149:15–150:15.

After reviewing the plaintiff's written statement, Ms. Laboon came to the DOJ office immediately, that same day, to discuss the plaintiff's concerns.  *See* Davis-Hall Aff. ¶¶ 22–23; Pl.'s Dep. at 150:13–15.  During the meeting with Ms. Laboon and Ms. Davis-Hall, the plaintiff explained that she believed Ms. Phelps meant no harm.  *See* Davis-Hall Aff. ¶ 23.  Ms. Laboon asked if the plaintiff wanted to transfer to a new work location, two blocks away, and the plaintiff, "who admittedly wanted to transfer, voluntarily and affirmatively made the decision to move to the new location."  Davis-Hall Aff. ¶ 23; *see also* Pl.'s Dep. at 19:5–15, 154:3–9.

After that meeting, Ms. Davis-Hall sent the plaintiff home for the day with pay, and immediately reassigned the plaintiff to the defendant's "Document Center," a facility located a block or two away.  *See* Davis-Hall Aff. ¶¶ 23, 25; Pl.'s Dep. at 157:4–158:1.  Ms. Laboon and Ms. Davis-Hall also met with Ms. Phelps' supervisor, and explained that they had transferred the plaintiff to another location.  *See* Davis-Hall Aff. ¶ 24.  Both Ms. Laboon and Ms. Davis-Hall requested to speak directly with Ms. Phelps, but Ms. Phelps' supervisor refused to allow them to do so.  *See id.*

The day after her meeting with Ms. Laboon and Ms. Davis-Hall, the plaintiff began her new assignment at the Document Center, where the plaintiff worked "in the same capacity in which she worked" at the DOJ, for exactly the same pay, and for exactly the same number of hours.  Davis-Hall Aff. ¶ 25; Pl.'s Dep. at 157:4–15, 158:2–16.

The plaintiff apparently did not view the reassignment as retaliation.  Pl.'s Dep. at 189:2–9.  While the plaintiff repeatedly asked Ms. Davis-Hall if she could transfer back to the DOJ office, *see* Davis-Hall Aff. ¶ 26; Def.'s Facts ¶ 66, the plaintiff also stated about her reassignment to the new building: "I love it here and all the people like me here, and I wouldn't

mind staying here." Pl.'s Dep. at 64:17–19; *see also* Davis-Hall Aff. ¶ 26. The plaintiff never

interacted with Ms. Phelps again after her transfer. *See* Pl.'s Dep. at 158:20–22.

### E.       The Plaintiff's Short-Term Employment with the Defendant Ends

After her transfer to the Document Center, the plaintiff worked without further incident

until her ninety-day short-term employment assignment ended on September 30, 2008. *See*

Davis-Hall Aff. ¶¶ 6, 28; Davis-Hall Aff. Ex. 6 (Termination letter, dated September 29, 2008, to

the plaintiff, explaining that "[y]our layoff is due to the ending of the contract under which you

have been working"). Effective on that date, the defendant "terminated all twenty . . . of the

provisional/temporary positions created to work on the short-term assignment at OIL," and the

defendant terminated sixteen of the twenty employees hired to work on that project. *Id.* ¶ 28.

None of the other individuals who were terminated submitted workplace complaints during their

short-term employment with the defendant. *See id.*

The four employees who were not terminated at that time were employees the DOJ had

specifically requested for other positions at the DOJ. *See id.* Neither Ms. Laboon nor Ms.

Davis-Hall had any input in deciding which individuals were selected by the DOJ for new

assignments. *See id.*

Several months later, three other employees terminated at the same time as the plaintiff

applied for new positions, and were rehired by the defendant. *See id.*

The plaintiff never formally reapplied for a position with the defendant. *See id.* ¶ 29.

The plaintiff did informally email Ms. Davis-Hall, on December 4, 2008, to inquire about

whether Ms. Davis-Hall had a job for her or for her daughter. *See* Davis-Hall Aff. ¶ 30. Ms.

Davis-Hall did not have any openings at OIL at that time, however. *See id.* The plaintiff

explained that she did not take personally Ms. Davis-Hall's not giving her a new assignment,

especially because Ms. Davis-Hall also did not have an assignment for the plaintiff's daughter, who had a college degree. *See* Pl.'s Dep. at 88:6–89:3.

### F.    Procedural History

Following the end of her short-term employment with the defendant, the plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about November 10, 2008. Pl.'s Dep. Ex. 13 (Charge of Discrimination filed by Paula V. Whiting against Labat-Anderson, Inc., Agency Charge No. 570-2008-00055 (Nov. 10, 2008)). The plaintiff later filed this action in the United States District Court for the District of Columbia against both the Attorney General of the United States and Labat-Anderson, Inc. *See* Compl.[9]

This Court has already resolved the Attorney General's Motion to Dismiss for Lack of Jurisdiction, ECF No. 18, which the Court granted as conceded after the plaintiff failed to respond to the motion for nearly two months. Mem. Op. & Order (Apr. 13, 2011), ECF No. 19. Following the dismissal of the Attorney General from the litigation and following discovery, Labat-Anderson, Inc. (the only remaining defendant) moved for summary judgment. *See* Def.'s Mot. That motion is now pending before the Court.[10]

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is properly granted against a party who, "after adequate time for discovery and upon motion, . . . fails to

---

[9] This case was randomly reassigned to the undersigned judge on January 20, 2011.

[10] During discovery, both of the plaintiff's attorneys moved to withdraw as counsel. Pl.'s Mot. to Withdraw as Counsel, ECF No. 22. The Court denied the plaintiff's motion without prejudice because the motion did not discuss the likelihood that such a withdrawal would significantly delay resolution of the case, nor explain why such withdrawal was necessary, and because it would have left the plaintiff without a lawyer in the midst of discovery. *See* Minute Order (July 5, 2011).

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party to demonstrate that there is an "absence of a genuine issue of material fact" in dispute. *Id*. at 323. "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*.

In ruling on a motion for summary judgment, the Court must draw all justifiable inferences in favor of the nonmoving party, and shall accept the nonmoving party's evidence as true. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986); *Estate of Parsons v. Palestinian Auth*., 651 F.3d 118, 123 (D.C. Cir. 2011); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." FED. R. CIV. P. 56(c)(3).

For a factual dispute to be "genuine," *Estate of Parsons*, 651 F.3d at 123, the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence" in support of its position, *Anderson*, 477 U.S. at 252, and cannot simply rely on allegations or conclusory statements, *see Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *See Anderson*, 477 U.S. at 250. "A fact is material if it might affect the outcome of the suit under the governing law, and a dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (citation and internal quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

12

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.  In that situation, "[t]he moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id*.

## III.   DISCUSSION

The defendant moves to dismiss the plaintiff's claims of sexual harassment (Count I) and retaliation (Count II).  Def.'s Mot.; Defendant Labat-Anderson Incorporated's Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") at 2.  The Court will address each of these claims in turn.

### A.      Plaintiff's Sexual Harassment Claim

The Court first turns to the plaintiff's claim that she was subject to sexual harassment and a hostile work environment based on the two incidents that occurred on August 11, 2008, and what the plaintiff characterizes as an inadequate response by the defendant to her allegations. *See* Pl.'s Opp'n at 4 ("Plaintiff experienced a hostile work environment because she believed that management did not take her allegations seriously"); Compl. at 5 (Count I) (asserting that the defendant "took [no] action against Ms. Phelps").  The defendant moves to dismiss the plaintiff's sexual harassment claim, contending that the plaintiff cannot establish a prima facie Title VII claim for sexual discrimination in the workplace because she cannot show that the alleged harassment (1) was based on sex, (2) was severe or pervasive, or (3) that the defendant is liable for the harassment.  *See* Def.'s Mem. at 12-20; Defendant Labat-Anderson Incorporated's Reply in Supp. of Mot. for Summ. J. ("Def.'s Reply"), ECF No. 30, at 5-10.  The plaintiff responds, in opposition, (1) that the nature of the touching at issue proves that the touching was based on sex, (2) that the two incidents and the defendant's inadequate response affected the plaintiff so

13

severely as to create a hostile working environment, and (3) that the defendant's inadequate response to the situation means that the plaintiff may impute liability to the defendant.  *See* Pl.'s Opp'n at 3-6.

### 1.    Sexual Discrimination and Hostile Work Environment

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ."  42 U.S.C. § 2000e-2(a)(1).  Such unlawful discrimination includes "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted).

> To make out a prima facie case for sex discrimination, a plaintiff must show
>
> (1) the employee was a member of a protected class; (2) the employee was subjected to unwelcome[] sexual harassment . . . ; (3) the harassment complained of was based upon sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment . . . ; and (5) the existence of respondeat superior liability.

*Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1122-23 (D.C. Cir. 2002) (alterations in original) (quoting *Yeary v. Goodwill Indus.-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir. 1997)). In this case, there is no dispute that the plaintiff is a woman and a member of a protected class and that she did not "welcome" her interactions with Ms. Phelps.  Nevertheless, since the plaintiff plainly cannot satisfy the fifth element of a prima facie case because she has not shown

the existence of respondeat superior liability, the plaintiff has not demonstrated a prima facie case of sex discrimination.[11]

### 2.    The Plaintiff Has No Basis to Impute Liability to the Defendant.

The defendant argues that it took appropriate, timely remedial action upon learning that Ms. Phelps, a non-employee, had inappropriately touched the plaintiff, and is therefore not liable for the alleged harassment.  *See* Def.'s Mem. at 18-20; Def.'s Reply at 8-10.  The plaintiff argues, in opposition, that the defendant's actions in response to the incidents were not timely or effective because, *inter alia*, the defendant "took no action" about the plaintiff's allegations of sexual harassment and did not contact human resources until after the plaintiff began distributing her written statement, nearly a month after the incidents.  *See* Pl.'s Opp'n at 5-6.

A Title VII plaintiff must show that the defendant is liable for the actions of the individuals causing the hostile work environment.  *See Davis*, 275 F.3d at 1123.  In order to prevail against an employer on a claim that a non-employee created a hostile work environment, "a plaintiff must show that the employer knew or should have known of the existence of the hostile work environment and failed to take proper remedial action."  *Simms v. Ctr. for Corr. Health & Policy Studies*, 794 F. Supp. 2d 173, 191 (D.D.C. 2011); *see also Curry v. District of Columbia*, 195 F.3d 654, 660 (D.C. Cir. 1999) (holding that an employer is vicariously liable for the actions of an employee's co-worker "if the employer knew or should have known of the harassment and failed to implement prompt and appropriate corrective action"); *Martin v. Howard Univ.*, No. 99-CV-1175, 1999 U.S. Dist. LEXIS 19516 at *7-8 (D.D.C. 1999) (explaining that the University defendant "may be responsible for [a non-employee's] conduct if it knew or should have known that [the non-employee's] actions created a hostile work

---

[11] Since the Court finds that the plaintiff cannot show the existence of respondeat superior liability, the Court need not reach the defendant's arguments regarding the third and fourth elements of a prima facie case of sex discrimination.

environment for the Plaintiff and failed to take corrective action").  When considering whether

an employer is liable for the hostile work environment created by a non-employee, the Court

must "consider the extent of the employer's control over the alleged harasser and any other legal

responsibility which the employer may have with respect to the conduct of the non-employees."

*Id*. at *8.  "An employer may avoid liability by asserting one of two affirmative defenses: 1) that

it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, or

2) that the plaintiff employee unreasonably failed to take advantage of any preventive or

corrective opportunities provided by the employer or to avoid harm otherwise."  *Simms*, 794 F.

Supp. 2d at 191.

The record indicates clearly that the defendant took timely, appropriate, and reasonable

action in response to the plaintiff's allegations of harassment on August 11, 2008, as well as in

response to the written statement she distributed on September 2, 2008.  When the plaintiff

informed Ms. Davis-Hall about the two incidents on the afternoon of August 11, 2008, Ms.

Davis-Hall responded with serious, purposeful steps to determine what corrective actions were

necessary.  First, Ms. Davis-Hall allowed the plaintiff to speak with her immediately even

though she was in the middle of a meeting with another employee.  *See* Davis-Hall Aff. ¶ 17.

Second, Ms. Davis-Hall inquired whether the plaintiff wanted to file a formal complaint, which

the plaintiff declined.  *See id*.  Third, notwithstanding the plaintiff's refusal to file a formal

complaint, Ms. Davis-Hall nonetheless promptly investigated the plaintiff's concerns.  Although

the plaintiff reported the incidents at 4:45 p.m, that same day, her supervisor notified Ms. Phelps'

supervisor about the plaintiff's allegations about Ms. Phelps.  *See id*. ¶ 18.  Ms. Davis-Hall also

spoke directly with Ms. Phelps, who denied the plaintiff's allegations.  *See id*. ¶ 19.  Fourth, Ms.

Davis-Hall immediately changed the office procedures, so that she herself would pick up and

deliver work files from Ms. Phelps' office rather than requiring the plaintiff to do so "in order to limit further contact between Ms. Whiting and Ms. Phelps." *Id.* ¶ 20.  Finally, Ms. Davis-Hall informed both the plaintiff and Ms. Phelps about the change in office procedure.  *See id.*  All of these remedial steps were evidently effective as the record is clear that following these remedial steps there was no further incident between the plaintiff and Ms. Phelps, and the plaintiff alleged no further sexual harassment, or any harassment, from Ms. Phelps.[12]  Pl.'s Dep. at 193:7–12.

The defendant also took prompt and appropriate action on September 3, 2008, when Ms. Davis-Hall learned that the plaintiff was distributing a written statement from her desk entitled "A Sexual Harassment Complaint Against Shirley Phelps."  First, Ms. Davis-Hall requested that the plaintiff forward her a copy of the written statement for her review.  *See* Davis-Hall Aff. ¶ 21.  Second, the plaintiff immediately contacted the defendant's director of human resources, Ms. Laboon.  *See id.* ¶ 22.   Third, Ms. Laboon, upon hearing about the plaintiff's written statement, came to the DOJ that same day to investigate, to meet with Ms. Davis-Hall and the plaintiff, and to discuss the plaintiff's allegations.  *See id.* ¶¶ 22-23.  Fourth, Ms. Laboon asked the plaintiff if she would like to be transferred to a new worksite located two blocks away, and the plaintiff agreed.  *See id.* ¶ 23; *see* Pl.'s Dep. at 158:17–19 (Q: "Did you have any objection to transferring to the new location?"  A: "No.  I was happy they didn't fire me.").  Fifth, the defendant sent the plaintiff home that day, with pay, and immediately implemented a transfer of

---

[12] While the plaintiff indicates that she mentioned to her supervisor in passing on the morning of August 11, 2008 that Ms. Phelps "grabbed [her] and was hugging and kissing on [her]," the plaintiff admits that at that time she did not inform her supervisor that Ms. Phelps had touched her breasts.  Pl.'s Dep. at 122:4–5, 11–13.  While she notes in her deposition that she asked the supervisor, "Can I be reassigned and moved?," *id.* at 122:6, she did not pursue this issue with the supervisor, and, furthermore, it is clear from the record that the plaintiff only made these comments to her supervisor after the supervisor questioned her about whether she had been at work that morning.  Since the plaintiff does not indicate that she told her supervisor that she believed she had been sexually harassed, assaulted, or that she was disturbed by her morning interaction with Ms. Phelps, it was reasonable for the supervisor not to follow up on the plaintiff's comment, made in passing, and only after the supervisor questioned her about when she had arrived to work, that she had been "hugg[ed] and kiss[ed] on," *id.* at 122:4–5, by a co-worker.  Even if the supervisor should have construed the plaintiff's comment as a complaint, however, the defendant timely followed up on the plaintiff's complaint regarding Ms. Phelps the same day, including by changing office procedures to minimize the plaintiff's interaction with Ms. Phelps.

the plaintiff to a new location, where she would be doing essentially the same work, for the same number of hours and at the same level of pay, and where she would have no chance of interacting with Ms. Phelps.  *See* Davis-Hall Aff. ¶ 23; Pl.'s Dep. at 158:9–16.  Sixth, following the meeting with the plaintiff, Ms. Davis-Hall and Ms. Laboon met with Ms. Phelps' supervisor about the situation.  *See* Davis-Hall Aff. ¶ 24.  Seventh, Ms. Davis-Hall and Ms. Laboon specifically requested that they be allowed to speak with Ms. Phelps directly but Ms. Phelps' supervisor "refused to allow [them] to do so and stated the DOJ would address the situation internally."  *Id*.  Following these remedial steps, the plaintiff never interacted with Ms. Phelps again, Pl.'s Dep. at 158:20–22, and the record reflects no further inquiries from the plaintiff to the defendant regarding the incidents of August 11, 2008.

All of these actions were taken promptly, and with the seriousness that disturbing allegations of the sort the plaintiff alleges require.  The plaintiff was correct to report these incidents to her supervisor, and her supervisor and the defendant's director of human resources acted efficiently to assess the situation and ensure that the plaintiff would not interact with Ms. Phelps again.  The defendant also essentially took exactly the action that the plaintiff wanted them to take.  When asked in her deposition, "So what did you want Labat to do if you didn't file a formal complaint?  What where you hoping they were going to do in response to your statement?" the plaintiff replied, "Assign me to someone else to work with in the building, you know, someone else."  Pl.'s Dep. at 154:3–8.  By moving the plaintiff to another building to ensure no further interaction between the plaintiff and Ms. Phelps occurred, the defendant honored the plaintiff's wishes to be reassigned away from Ms. Phelps.  Furthermore, the plaintiff actually acknowledged that she liked the new building and wished to stay.  *See id*. at 64:16–19.

Although the plaintiff suggests the defendant should have done more to ensure that the plaintiff "was in a safe work environment," Pl.'s Opp'n at 6, the Court disagrees that any further action was required.  As soon as the plaintiff informed the supervisor of the two incidents, in which she alleges Ms. Phelps grabbed her breasts repeatedly, the supervisor took immediate action to ensure that the plaintiff was in a "safe work environment."  Upon learning indirectly, a month after the incidents, that the plaintiff was still concerned about the incidents of August 11, 2008, the supervisor again took immediate action, calling upon the director of human resources who moved the plaintiff a couple of blocks away to another worksite to ensure no further contact with the alleged aggressor.  In sum, the record reflects that the defendant took reasonable, timely, appropriate action in response to the plaintiff's allegations.  *See Carter v. Greenspan*, 304 F. Supp. 2d 13, 26 (D.D.C. 2004) (finding an employer took reasonable steps concerning alleged harassment "by immediately involving an Employee Relations Specialist, conducting a meeting with the parties, and arriving at a workable solution for everyone involved.").  Accordingly, the plaintiff has no basis to impute liability to the defendant, and thus she has failed to establish a prima facie case of sexual harassment.

## B.     Plaintiff's Retaliation Claim

The Court next turns to the question of whether the plaintiff's termination was retaliatory.[13]   In moving for summary judgment, the defendant asserts that the plaintiff cannot

---

[13] In her Complaint, the plaintiff argues that the defendant "retaliated against her [both] by transferring her from her former work location to another location the day after she told other employees that she was sexually harassed and by not permitting her to work on another assignment after she complained about the sexual harassment she experienced."  Compl. at 5 (Count II).  In her deposition, however, the plaintiff conceded that she did not believe her relocation to the Document Center was retaliatory.  Pl.'s Dep. at 189:2–5 (Q: "So the termination, not the relocation, was what you believe was retaliatory?" A: "Right, because my family said I shouldn't have said nothing and I would still have my job."); *see id*. at 193:15–16 (stating that "the retaliation was being fired for me complaining").  Although the plaintiff attempts to argue in her Opposition that the plaintiff's transfer to another building "was a form of punishment in that Plaintiff had performed exceptional work where she was and had not engaged in any problem behavior herself," Pl.'s Opp'n at 7, the plaintiff provides no citation for this conclusory statement and provides no explanation for why the plaintiff acknowledged at her deposition that her only claim for retaliation was

establish a prima facie claim for retaliation, and that, even if she could, the defendant had a legitimate, non-retaliatory reason for the plaintiff's termination – namely, the end of her short-term employment – and that there is no evidence of pretext. Def.'s Mem. at 20-25. The plaintiff, in a one-paragraph opposition, argues that the defendant retaliated against the plaintiff both by transferring the plaintiff to another building and by terminating her after her 90-day contract expired. Pl.'s Opp'n at 7.

Title VII of the Civil Rights Act of 1964 prohibits an employer from retaliating against an employee "because [the employee] has opposed any practice made an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-3(a). Where there is no direct evidence of retaliation, the Court analyzes a plaintiff's retaliation claim under the familiar burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792, 802-05 (1973). *See Holbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999) (citing *Carney v. Am. Univ.*, 151 F.3d 1090, 1094 (D.C. Cir. 1998)). Under the *McDonnell Douglas* framework, "[a] plaintiff must [first] show that (1) she engaged in statutorily protected activity; (2) her employer took an adverse personnel action against her; and (3) a causal connection between the two exists." *Holbrook*, 196 F.3d at 263. Following the plaintiff's showing, "the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action." *Id.* If the employer makes this showing, then "[t]he employee must then prove by a preponderance of the evidence that the asserted reason is a pretext for retaliation." *Id.*

In this case, the plaintiff alleges that her termination was an adverse action and the defendant has proffered a legitimate, non-discriminatory reason for her termination, namely that she had a short-term position and that the defendant was forced to eliminate the plaintiff's

---

based on her termination. Given the plaintiff's concession during her deposition, the Court will construe the plaintiff's claim for retaliation as based entirely on her termination.

position, and the position of the 19 other provisional workers hired for a ninety-day term, "when the funding for those positions ended." Def.'s Mem. at 23; *see also* Davis-Hall Aff. ¶ 6 ("After September 30, 2008, all U.S. government funding for the 90-day project terminated, the task order ended, and all twenty (20) of the temporary positions created to work on the short-term project were eliminated."). Once the employer has proffered a legitimate, non-retaliatory reason for the challenged adverse action, "the central question is whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-retaliatory reason was not the actual reason and that the employer intentionally retaliated against the employee in violation of Title VII." *McGrath v. Clinton*, 666 F.3d 1377, 1383-84 (D.C. Cir. 2012) (citations and internal quotation marks omitted).

Here, the plaintiff has clearly not produced enough evidence for a reasonable jury to find that the defendant's reason for her termination was not the actual reason, and that she was retaliated against. To the contrary, it is clear from the record that the plaintiff was terminated solely because she was subject to a short-term, temporary assignment, for which the DOJ's funding had expired. *See Newton v. CBS, Inc.*, 841 F. Supp. 19, 23 (D.D.C. 1994) (finding that the need to furlough employees for financial reasons constitutes a legitimate, non-discriminatory reason for terminating the plaintiff's employment). First, the record reveals that the defendant terminated the plaintiff's employment, not to retaliate against her, but because the contract under which the defendant hired her had expired. *See* Davis-Hall Aff. ¶¶ 6, 28. Second, there is no dispute in the record that the plaintiff had knowingly accepted a short-term position.[14] *See* Pl.'s Dep. at 58:13–18. Even assuming the defendant wanted to retain the plaintiff, it could not have done so, because the funding for the plaintiff's position had run out. *See* Davis-Hall Aff. ¶ 6.

---

[14] While the plaintiff believed that the defendant would retain some of the temporary hires, she had no guarantee that she would be retained. *See* Pl.'s Dep. at 50:18–22.

Third, along with the plaintiff, the defendant terminated all of the other 19 short-term positions filled at the time the plaintiff was hired.[15]  *See id.* ¶ 28.  Fourth, the plaintiff offers no evidence to rebut the defendant's proffered reason for the plaintiff's termination, and in fact agrees with the defendant that she was subject to a short term-assignment.  *See* Pl.'s Dep. at 58:13–18.  Finally, there is simply no evidence in the record that the defendant's reason for terminating the plaintiff's employment was a pretext for discrimination.  *See, e.g.*, *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005) (affirming summary judgment for the defendant on the plaintiff's retaliation claim where the defendant's "non-discriminatory justifications for its actions remain completely unrebutted").  Accordingly, since the record reflects that the defendant had a legitimate, non-discriminatory reason to terminate the plaintiff's employment, and there is no evidence of pretext, the defendant must be granted summary judgment on the plaintiff's retaliation claim.

## IV.    CONCLUSION

For the reasons discussed above, the defendant's Motion for Summary Judgment, ECF No. 28, is granted.  An appropriate Order accompanies this Memorandum Opinion.


**Date:** February 28, 2013


_____
BERYL A. HOWELL
United States District Judge


---

[15] Although the defendant retained four employees, the record reflects that neither Ms. Davis-Hall nor Ms. Laboon had any discretion in choosing which of the twenty employees to retain.  *See* Davis-Hall Aff. ¶ 28.  Rather, the defendant retained these four individuals because the DOJ specifically asked the defendant to do so.  *See id.*  The defendant also later rehired three individuals whose positions were terminated at the same time as the plaintiff's but the defendant only hired those individuals after they reapplied for a position, which the plaintiff never did.  *See id.* ¶¶ 28-29.